Cory R. Laird, Bar No. 4970
LAIRD COWLEY, PLLC
2955 Stockyard Road
Missoula, Montana 59808
Telephone:   (406) 312-1500
Facsimile:   (406) 541-4101
Email:       claird@lairdcowley.com

Lawrence Ream, WSBA No. 18159
Troy Greenfield, WSBA No. 21578
SCHWABE, WILLIAMSON & WYATT
1420 5th Avenue, Suite 3400
Seattle, Washington 98101
Telephone:   (206) 622-1711
Facsimile:   (206) 292-0460
Email:       lream@schwabe.com
             tgreenfield@schwabe.com

Keith D. Marr, Bar No. 5999
CONNER & MARR, PLLP
P. O. Box 3028
Great Falls, Montana 59403-3028
Telephone:   (406) 727-3550
Facsimile:   (406) 727-1640
Email:       keith@connermarr.com

*Attorneys for Dennis P. Conner*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MONTANA

| In re, | Case No. 15-60979-11 |
|---|---|
| SHOOT THE MOON, LLC, | **PETITIONER DENNIS CONNER'S BRIEF IN SUPPORT OF MOTION TO FILE PERSONAL CLAIMS AGAINST TRUSTEE AND HIS ATTORNEY UNDER BARTON DOCTRINE** |
| Debtor, | |

Petitioner Dennis Conner ("Conner") has moved this Bankruptcy Court, asking for leave to initiate a Montana Federal District Court claim personally against Trustee Jeremiah Foster ("Foster") and his attorney, David Cotner ("Cotner"), for sanctions and attorney fees. The Barton doctrine extends limited protection to Foster and Cotner as court-appointed officers of the Bankruptcy Court. Under the Barton doctrine, however, this Court may grant Conner leave to sue Foster and Cotner personally if a prima facie case is established for breach of fiduciary duties. *In re Crown Vantage, Inc.,* 421 F.3d 963, 972 (9th Cir. 2005).

## SUMMARY OF ARGUMENT

Upon information and belief, Conner contends that Foster and Cotner, as his attorney, have willfully and deliberately breached fiduciary duties owed creditors by: (1) filing adversary proceedings without having done adequate investigation to determine the legitimacy of the claims; (2) spending money in the debtor's estate on adversary proceedings not well grounded in fact; (3) failing to terminate adversary proceedings after it became obvious the claim was frivolous and without merit; and (4) wrongfully running up litigation expenses. This conduct is the result of actions directed by Foster from which he wrongfully profits from his company's, Resolute Commercial Services, LLC ("Resolute"), involvement in the Chapter 11 Estate of STM ("STM") bankruptcy and adversary actions filed by its Liquidating Trust ("Trust"). His profiteering creates a disincentive for expeditiously closing the Estate

and an incentive for maintaining the creative prosecution of baseless and marginal claims. The result is the financial bleeding of the Estate's creditors and unreasonable taxing of the liquidating trusts adversaries' (including Conner's) time and money.

## FACTUAL BACKGROUND

On November 5, 2015, after Foster declared he was a principal in Resolute and its disinterestedness in the proceedings (Docs. 26 and 60, BC), this Court appointed him trustee, without condition, for the Chapter 11 Estate of STM. (Doc. 61, BC.)

11 U.S.C. § 1104(d) governs the process of trustee appointment in a Chapter 11 case. It provides:

> If the court orders the appointment of a trustee, ... then the United States trustee, after consultation with parties in interest, shall appoint, subject to the court's approval, **one disinterested person** other than the United States trustee to serve as trustee ... in the case. [Emphasis supplied.]

A trustee who hires his own professional firm to assist him cannot be a "disinterested person" who has no interest adverse to the estate. Once the trustee's firm is hired by the estate, the trustee's personal interests are implicated. *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 258 (2d Cir. 1996).

A Chapter 11 trustee is bound by duty of loyalty, obligating trustees to refrain from self-dealing, avoid conflicts of interest and appearance of impropriety, treat all parties to the case fairly, and maximize the value of the estate. *In re Spielfogel,* 211

B.R. 133, 144 (Bankr. E.D.N.Y.1997). The main job of a trustee is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest." 11 U.S.C. § 704.

Foster describes himself as a "serial entrepreneur." (See attached Exhibit A, April 8, 2020, deposition of Jeremiah Foster, 13:13-17, with exhibits.) Included among Foster's ventures is Resolute. Foster is the president and founder of Resolute through which he conducts a "financial advisory business." (Foster deposition, 12:13-17; 17:13-17.) Foster owns Resolute personally and through the beneficial interests of a trust belonging to him and his wife. (*Id*., 12:18-13:2.)

To profit from the Chapter 11 Estate beyond trustee fees, on February 3, 2016, Foster applied to this Court for approval to employ Resolute to perform accounting and consulting services. (Doc. 240, BC). On February 16, 2016, the Acting United States Trustee objected because: "The Trustee's proposal to hire his own firm represents a conflict of interest prohibited by section 327 of the Bankruptcy Code, and would also sidestep the limitations on trustee compensation in sections 326 and 328." (Doc. 275, BC).

On February 18, 2016, the United States Trustee noticed a Subpoena for a Rule 2004 examination of Foster commanding production of copies of Foster's most recent K-1 regarding Resolute, Resolute's most recent balance sheet and profit and

loss statement, and documents sufficient to show amounts paid to each employee of Resolute in 2015. (Doc. 286, BC). Facing this inquiry, Foster withdrew the Application for Employment of Resolute. (Doc. 434, BC.) Foster never reapplied for permission to hire Resolute in the Estate or adversary proceedings. (See attached Exhibit B, Answers to Conner's Requests for Admission Nos. 38 and 39.)

Despite withdrawing his employment application, Foster hired Resolute as his "team" in the Chapter 11 Estate and to assist in prosecuting adversarial claims:

> A. When I was asked to be the operating Chapter 11 trustee, Resolute, as a result of being my firm, worked with me, but they were never formally hired, because Neal Jensen did not think of it as a scenario that he wanted to suggest. So I ultimately engaged the services of my team to help me perform my duties.

Foster deposition, 23:12-17.

Resolute and Foster grotesquely profited from Resolute's employment. Nicole Manos ("Manos") is a Senior Managing Director for Resolute. Resolute pays her an annual salary of $110,000. (See attached Exhibit C, April 7, 2020 Manos Rule 30(b)(6) deposition on preferential transfer, 9:2.) She worked these percentages of her time on STM: from October through December 2015, 90%; January to September 2016, 80% to 90%; October to December 2016, 60% to 70%; 2017, at least 60%; 2018 through 2019, 40% to 50%; and 2020, 80%. (*Id*., 9:20-11:10.) As a standard, Manos works about 1,800 billable hours a year. (*Id*., 14:22-23.) At a discounted rate of $300 an hour, she generates $540,000 in annual income

---

for Resolute, for which she is paid $110,000. (*Id.*, 15:3-11.) Several other Resolute employees worked for the Estate or Liquidating Trust. Conner has asked for discovery on amounts paid Resolute and its employees by STM and the Trust. (See attached Exhibit D, August 11, 2020, letter to Cotner from Conner's attorney, Keith Marr, concerning discovery disputes.) Given Manos' testimony, Resolute likely was paid over $1,000,000 by the Estate.

This Court has retained jurisdiction over all matters arising out of and related to the Chapter 11 case and Plan over its Liquidating Trust, including determination of all controversies and disputes arising under the Trust agreement. (Docs. 1128, 1141, BC.)

On May 23, 2016, Foster, through Cotner, applied to Approve Employment of him and his law firm to investigate and pursue claims against third parties on behalf of the Estate. (Doc. 524, BC.) The application outlined a proposed contingency fee, agreed to by the Trustee, with a sliding scale from 25% to 45% of a recovery. The proposed contract authorized Cotner "to incur all reasonable costs and to hire any investigators, consultants, or expert witnesses reasonably necessary in Cotner's judgment."

On June 14, 2016, the Committee of Unsecured Creditors filed its Objection to Application of Trustee to Approve Employment of Contingency Counsel. (Doc. 593, BC.) The Committee objected to the idea that "the Trustee: (a) should be

involved in pursuit of assets, or otherwise in this bankruptcy case, once the contemplated sale of all the Debtor's assets has concluded, thereby earning a commission based fee with respect to the assets recovered and distributed in connection with such litigation; and (b) control who is ultimately engaged to pursue assets on behalf of the unsecured creditors or control the terms of such engagement given that the recovery of assets after the contemplated sale will be on behalf of the unsecured creditors and should, therefore be controlled by the Committee." (*Id*.). The Committee raised its concerns with Cotner's firm, discounted by Cotner as unimportant. The Committee asserted that Cotner's disregard of the concerns of the Committee and his loyalty to Foster suggested a conflict of interest existed. The Committee informed the Court of an agreed-to contingency fee agreement between the Committee's attorneys in which a much more beneficial fee structure for the Unsecured Creditors was proposed.

On December 6, 2016, a hearing was held on Foster's application to employ Cotner's law firm. An audio recording is attached to Doc. 903. A transcript has been ordered. On December 8, 2016, this Court ordered Foster's application approved and authorized him to employ Cotner's firm. (Doc. 905, BC.) On May 1, 2017, Cotner left his former law firm, and started his own firm, Cotner Law, PLLC. Foster asked and this Court approved employment of his present firm to

pursue claims against third parties on behalf of the estate under terms identical to those when Cotner was with his former firm. (Docs. 1052 and 1115, BC).

Foster, having received the good news approving him and to work on the adversary claims, filed the Liquidating Trust's First Quarterly Status Report on May 22, 2018, noting "Counsel have retained Resolute Commercial Services as a financial consultant to compile Shoot the Moon accounting data for adversary claim support and reclassification of financial statements." (Doc. 1207, BC.) On January 1, 2020, Cotner gave Resolute a raise in the amount paid for its services through which Foster is grossly profiteering. See attached Exhibit E, Answer to Interrogatory No. 4 of Plaintiff's Responses to Second Set of Discovery Requests to Plaintiff. Resolute now charges $395 per hour for Manos' trial and deposition testimony and $345 per hour for work when not testifying. (Exhibit C, Manos Rule 30(b)(6) deposition on preferential transfer, 8:4-8.)

Ten Quarterly Status Report have been filed by Foster as Liquidating Trustee through Cotner. (Doc. Nos. 1207, 1216, 1239, 1256, 1285, 1295, 1314, 1352, 1363, and 1364, BC.) As of the Tenth Quarterly Report, filed on July 17, 2020, $772,705 has been paid to Resolute and $5,249.30 more is accrued for work done on behalf of Foster from which Foster is profiteering. (Doc. 1364, BC.)

Conner believes that the adversary proceedings filed against him are frivolous and without merit and that Foster and Cotner are wrongfully running up litigation

expenses in prosecuting claims against him. He is filing summary judgment motions in federal district court and wishes to seek attorney fees personally from Foster and Cotner, which may depend on this Court's granting relief under the Barton doctrine.

Conner is not the only adversary of Foster and Cotner who holds the opinion that Foster and Cotner have filed frivolous claims while running up litigation expenses. Jerry Hall, who was the chairman of the Committee of Unsecured Creditors, and his wife, Jan, invested their entire $400,000 life savings in Shoot the Moon III, LLC ("STM III") in return for its promissory notes. See attached Exhibit F, Affidavit of Jerry Hall at ¶¶ 1, 14. On October 20, 2017, Foster, through Cotner, filed an adversary proceeding against the Halls alleging they received $118,280.00 in preferential transfers. *Id.* at ¶ 5. After being served with the summons, Cotner was advised through the Hall's attorney that they had lost their entire $400,000 in life savings; and during the 90-day period before STM's bankruptcy, they had invested $150,000 into STM III while only receiving $118,280 back in loan payments. *Id.* at ¶ 6. On May 8, 2018, a Second Amended Complaint was filed, again alleging the Halls owed $118,208.00 because of preferential transfers. By then, Foster and Cotner knew that during the preferential period, the Halls had invested $50,000 in STM III on July 24, 2015; $50,000 on August 31, 2015; and $50,000 on September 18, 2015. Foster and Cotner also knew the Halls had raised affirmative defenses, including that the payments were made in the ordinary course

of business and according to ordinary business terms. *Id.* at ¶ 8. Based on their attorney's investigation and strong assurances, the Halls considered the adversarial claim against them to be frivolous and totally without merit. *Id.* at ¶¶ 9-13. Nevertheless, the Halls settled the adversary claim for $4,000 because they had already paid their attorney approximately $13,000 and it would have cost them much more to successfully defend than settle. *Id.* at ¶ 13.

On June 14, 2016, Jerry Hall was chairman of the Committee of Unsecured Creditors. However, he had no idea until August 11, 2020, about Foster's connection with Resolute, its involvement in STM, or what would be its future involvement in working for the Liquidating Trust; and based upon information and belief, no other Committee member knew about Resolute's involvement or contemplated future involvement. *Id.* at ¶ 14.

Historically, this Court has taken a dim view of the hiring of professionals without Court approval, particularly when markups in fees are hidden, shortchanging creditors. Conner is not aware of anything to suggest Resolute's involvement has been done with the U. S. Trustee's consent or approval. It is very unlikely the Assistant U.S. Trustee in Montana or the trial attorney in Montana would have consented or approved, especially in light of the objection that the U.S. Trustee's office filed opposing the employment of Resolute. In similar cases, professional fees have been disgorged. See the August 7, 2013, Motion for Examination and

Disgorgement of Professional Fees and for Other Relief filed by the Office of the U. S. Trustee in the case of Debtor, *Vann's Inc*., US Bankruptcy Court for the District of Montana, Case No. 12-61281-11, (Doc. 527); and the September 6, 2013, Stipulation reached on disgorgement (Doc.559); and *In Re Jore*, 298 BR 703, the case referenced in the U. S, Trustee's argument in *Vann's* where this Court ordered disgorgement of professional fees.

## ARGUMENT

Foster, a self-described "serial entrepreneur," has exploited his trustee powers for personal and financial gain to the detriment of Shoot the Moon creditors like Conner. Through his scheme, aided by Cotner, Foster sues Shoot the Moon creditors and drags them through protracted adversarial litigation. During this litigation, Cotner hires Foster's personally-owned consulting firm to provide accounting, support, and "expert" opinions. This business model likely generated over $1,000,000 from the Estate and has generated over $770,000 from the Trust for Resolute. This business model dis-incentivizes expeditious resolution of all adversarial claims and promotes prosecution of frivolous claims. This scheme circumvents the statutory limited fee Foster would otherwise recover under the bankruptcy statutes. This has led to: (1) filing of adversary proceedings without having done adequate investigation to determine the legitimacy of the claims; (2) spending money in the debtor's estate on adversary proceedings not well grounded

in fact; (3) failing to terminate adversary proceedings after it became obvious the claim was frivolous and without merit; and (4) wrongfully running up litigation expenses.

In the preferential transfer claim against Conner, Foster's only purported expert on preferential transfer is Resolute employee Manos. When questioned about Conner's ordinary course of business defense, Manos replied, "**I'm not familiar with that**." See Exhibit C, Manos deposition at page 35. Manos is also Foster's purported expert on fraudulent transfer. Foster alleges that Shoot the Moon X Realty, LLC, ("STMXR") was insolvent when it made a fraudulent transfer to Conner of property on August 6, 2014. Foster supports his claim through the purported expert opinion of Manos. At page 22 of her March 31, 2020, expert disclosure on fraudulent transfers, Manos admits:

> I have not performed an audit of financial statements in accordance with Generally Accepted Auditing Standards, nor have I performed a review or compilation of financial statements in accordance with the standards set forth by the American Institute of Certified Public Accountants.

Through creative accounting, Manos puts the cash held in STMXR's bank account on August 6, 2014 at $86,017.20, just low enough to make the company insolvent. She footnotes her opinion with a comment:

> Cash balance reflects the reconciled bank balance which included the removal of all intercompany transactions that would have been returned for non-sufficient funds as of August 6, 2014.

---

In response to Conner's Requests for Admission Nos 5, 7, and 8, however, Foster is forced, because of uncontroverted evidence, to admit that no checks deposited into the STMXR account were returned for insufficient funds, nor were any intercompany transfers voided for insufficient funds that would affect its actual cash balance of $221,626.61 at the close of business on August 6, 2014.

Neither Foster, Cotner, nor Manos have inspected the transferred property they claim Conner paid too little for, and no expert appraiser has been identified by Cotner to offer an opinion on the property's value at the time of transfer. Conner's statements of uncontroverted facts on preferential and fraudulent transfer in support of motions for summary judgment (attached as Exhibits G and H) are replete with examples of why he should be granted summary judgment and awarded attorney fees because of the equitable exception to the general rule available in those unique factual situations in which a party is forced into a frivolous lawsuit and must incur attorney's fees to dismiss the claim.

The prevailing rule of law deems Foster, in his capacity as bankruptcy trustee, an officer of the bankruptcy court. As such, a party must obtain permission from the bankruptcy court to bring tort claims (malicious prosecution, breach of fiduciary duties, etc.) against a bankruptcy trustee in another forum. See *Crown Vantage*, 421 F.3d at 970-71. The same rationale applies to claims against counsel representing

the bankruptcy trustee. See *In re Lowenbraun*, 453 F.3d 314, 321 (6th Cir. 2006). Courts refer to this procedural protocol as the Barton doctrine. However, the doctrine's protections are entirely procedural. As noted by the United States Bankruptcy Court for the District of Utah:

> *Barton* "does not shield trustees from lawsuits. Rather, the doctrine requires the bankruptcy court to determine *where* the suit may be brought, not *whether* the trustee may be sued." In sum, *Barton* is strictly a "jurisdictional gatekeeping doctrine," and it strips all courts—except the bankruptcy court that appointed the trustee—of subject-matter jurisdiction to hear a lawsuit against the trustee unless the appointing court gives its permission to sue the trustee elsewhere. Only if the Debtors' proposed complaints pass through *Barton's* jurisdictional gate will the Debtors be able to file suit against the Trustee outside of this Court.

*In re Christensen*, 598 B.R. 658, 664-65 (D. Utah 2019). "[W]hile permission to prosecute an action against a trustee can involve discretion, such permission ordinarily should be granted unless it is clear that the claim is without foundation." *Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975); *McDaniel v. Blust*, 668 F.3d 153, 157 n.1 (4th Cir. 2012); *In re National Heritage Foundation, Inc.*, 510 B.R. 526, 537 (E.D.Va. 2014).

## CONCLUSION

Conner is pursuing the requisite leave from this Court to bring claims against Foster and Cotner. Until Conner is given leave under the Barton doctrine, Foster and Cotner can act with near impunity. Given the prima facie establishment of

breach of fiduciary duties, the gravity of the situation and hardships Conner has endured in defending against the frivolous claims, Conner's motion for leave to initiate Montana Federal District Court claims personally against Foster and Cotner, for sanctions and attorney fees should be granted.

Dated this 14th day of August, 2020.

                              CONNER & MARR, PLLP

                              By: _/s/ Keith D. Marr_____
                                    Keith D. Marr, Bar No. 5999
                                    *Attorneys for Dennis P. Conner*

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that a copy of the foregoing document was served electronically to all interested parties by ECF on the 14th day of August, 2020.

                              By: _/s/ Keith D. Marr_____
                                      Keith D. Marr, Bar No. 5999
                                    Email: keith@connermarr.com
                                    *Attorneys for Dennis P. Conner*